2022-2027. Mr. Brunelli. Thank you, Your Honor. Good morning. May it please the Court. My name is Robert Brunelli. I represent Olati, the appellant in this case. This appeal flows from a final written decision issued by the Patent Trial and Appeal Board, finding all claims of the 432 patent invalid, either as anticipated or obvious. The Board's findings are all based on an erroneous construction of the term real-time. Under a proper construction, independent claim one and all its dependent claims should be found valid. Separately, the Board's holding that dependent claims 7 and 8 are obvious is unsupported by substantial evidence. You don't mean are obvious, you mean were or would have been. We're talking about a time in the past, not today where you can have hindsight. Agreed, Your Honor. But I'm talking about what is obvious, how obvious. Agreed. I apologize for the mistake. Is the issue here whether continuous should be read into the claims? No, I believe the issue here is that real-time is not to be judged by an outcome, which is what the Board interpreted the term to mean. It should be interpreted based on time. And what does real-time really mean? It happens as right now we are in real-time. By adding a distinction to this claim language that ties the term real-time to a machining outcome, the Board eliminated the time constraints entirely. What do you mean by machining outcome? Are you referencing to whether the machine stops or pauses? I thought the real-time was real-time meaning there's no pausing, no termination, as opposed to stopping the mating process in order to check a die or to check on the material. Let's make sure that I'm on the correct page here. I understand that an analyzer is getting information from sensors. That analyzer will make a determination that an adjustment to power must be made to support the machining process somehow, make a better quality product, preserve the tool, what have you. The analyzer sends the information. It is determined. Yes, an adjustment is required. It sends that information to a controller. The controller receives the information and then needs to adjust power, either to the feed or to the tool, what have you. Counsel, are you walking away from the continuous argument? The brief, the blue brief, which does not contain your name, says the real-time requires continuous machining operation. Are you abandoning that argument? I'm not abandoning it, but I'm not focusing on it during this argument, Your Honor. That's your primary argument in your brief. I believe that continuous is subsumed into the timing. If we're looking at the controller, the claim language says the controller needs to do something in real time. That something is the adjustment of the power. What is real time? It's essentially instantaneously. What the board ended up doing was saying, well, these references that are being applied don't disclose how quickly the controllers in these references are doing anything. If we have to look at a time constraint, we can't, my reading of the written decision, we can't find how these references support that notion. But these references are directed to creating a particular quality product. And so what the board did, as I view it, is they correlated an outcome and says that if that outcome can be achieved, it did it quickly enough, and quickly enough equals real time. I'm suggesting real time is not quickly enough. Real time is essentially instantaneous. And I think that's where this all went off the tracks. The way Pat and I attempted to get those concepts into the claim construction was through the notion of time response constraints. That was advanced to the board. The board didn't accept that and chose to move in a different direction, the direction proposed by Petitioner. That, to me, is where everything went awry, at least on that issue. What happens, in your view, when you have a real time adjustment? Exactly what happens in the process? The analyzer will identify that an adjustment needs to be made. To make that adjustment, do you have to turn off the machine or slow it down, or do you keep on going at the same rate? The machine is doing its thing, and then the controller gets the instructions. The controller says to the machine, now you must do something. Am I following the court? Yeah. To do that one thing, that adjustment, do you have to stop the process? No. It has to happen in real time. And that's your argument, that it's real time, there's no stopping the process. Correct. Sounds continuous. It is continuous, and it's subsumed in this concept of real time. Yeah. Agree. That wasn't a conclusion. I understand, Your Honor. If the court agrees that the construction is not, that it was adopted and applied by the board, is not accurate, I would ask that all of the findings of invalidity be vacated, and I believe we can have just a reversal. But if remand is what the court thinks is appropriate, fine as well. I'd now like to turn to, separately, the board's holdings of Claims 7 and 8, being found obvious. Claim 7 depends from Claim 1 and requires that a portable display device communicate with the controller to inform a user of power adjustments made by that controller. The board found both Orabee and Dalio, the primary reference, disclosed display devices that could communicate with a controller, and that Eddie disclosed a machining system having a controller that could communicate with a portable display device. The board found that a POSITA would have combined these references to render Claims 7 and 8 obvious. The problem with the board's finding is that neither Dalio nor Orabee disclosed displaying information that informs a user of power adjustments made by the controller. At the best, the evidence establishes that operational data can be displayed. It seems undisputed, based on the record, that the changes in power reflected in operational data could be due to any number of reasons, not only because of an adjustment made by a controller. The board, nowhere in its decision, identifies any evidence that any reference discloses sending to a display information informing a user that the controller made a particular power adjustment. So is it the case that you can't tell what adjustments were made or how they were made based solely on operational data? That is the point. Yes, Your Honor. You had expert testimony in that regard. We did. And as far as I can tell, and I invite the other side to address this, I didn't see that that was rebutted, or that there was evidence to the contrary that was submitted by the other side. My reading of the record indicates the same, Your Honor. Yeah. Yeah. I think... You're into your bone. You can continue to speak or save it as you wish. I think the point here, I will use about another minute, I think the point here is that we've got two references, neither of the references identifying on a display adjustments made by the controller or that could have been made by the controller. The references are agnostic to the operational, how the operational data occurred, and that does violence to the claim. Thank you. And we'll save the rest of your time for Mr. Lyons. Your Honor, I'm Michael Lyons for HAWS. I'll just jump in where counsel did on claim construction. First of all, counsel advanced a new interpretation in real time that was never adopted by any expert, never put in any brief of saying real time means essentially instantaneous. That's new. I don't think it's appropriate to have a new argument raised for the first time, an oral argument. Counsel objected to the board's construction as being directed to an outcome. That was based on both parties' agreement that the construction should include language that it is to achieve a desired machine and system performance. That was agreed language. That wasn't advanced exclusively by the petitioner. That was the patent owner's belief as well. The question was what language would go with achieving that result? And the language that was advanced by petitioner was quickly enough. Now, interestingly, that language came from and was derived from the expert testimony from the patent holder. That was language that the patent holder used. The language that was advanced by the patent holder was a time response constraint sufficient to achieve the results. Do you see any difference between those two? A time response sufficient or quickly enough? I mean, one sounds more technical and formal, but it sounds to me like they mean the same thing. It's sufficient to get something done. That's exactly where the board landed, and I agree with you, Your Honor. The board said, quote, the patent owner and its expert both appear to equate sufficient time response constraints to quickly enough or the like. The testimony, and it's right out of their expert, the lobby's expert's testimony. I mean, here's the question, as clear as it could be, to their expert question. First of all, what do you mean by time response constraints? Their expert said, quote, that the real-time adjustments must be done sufficiently quickly, so to speak, so that they can have the beneficial effect that is intended by a controller, for example, preventing chatter. So, I mean, that's where the quickly enough came from, and the board found both experts on both sides agreed that that's all that's required to be in real time. Nothing is instantaneous, by the way. I mean, you can't detect a problem. So you're running a machining operation. You detect a problem. Some force on the tool is exceeding a boundary. You're getting chatter, which is when the cutting piece starts vibrating, and you hear noise. You can try to correct that. Nothing is instantaneous. You'd love it to be instantaneous, but things take time. You have to observe it. You have to calculate a response. You have to send a signal. The machine has to then respond to that signal, so there's always going to be some lag. And so one of the questions that did come up is, you know, what is fast enough? And what every expert turned to and what the board ultimately adopted was it's a functional definition, that it's got to be fast enough to achieve the result. The only problem the patent actually talks about is chatter. And for example, the Delio reference, it also has a system for addressing chatter, and it has a system that talks about making a feed halt and doing it. And in that case, it says fast enough to stop the chatter, so it would meet that definition. But even if it didn't meet that definition, it actually says it makes the halt within 10 milliseconds. So that's a tiny fraction of a second. And it says it does that in order to avoid chatter that could potentially harm the device. So any way you look at it, you've got clear disclosures that meet any reasonable construction. And I want to also point out that the patent doesn't provide any time limit. So counsel suggested that things went awry somehow because the board failed to adopt a construction saying you've got to give me a time limit. You will make this adjustment within one second, or that's not real time, or even fast or instantaneous. I don't know what could meet that. But the patent that's the subject of the decision does not provide any time restrictions at all. It also talks just in functional terms. I mean, it does say it's trying to adjust chatter. That's why the parties agreed that if it's fast enough to do that, that would work. The experts also explicitly testified there is no time limit. So Eladi's expert testified, quote, there is no time limit, so to speak, that qualifies as real time. Everybody agreed there is no time limit. You can't just say it's a half second, it's a tenth of a second. It really depends on what you're trying to achieve. In the Araby reference, the goal was to avoid tool wear. And so the way Araby did that in his inventive system that he actually built, his PhD thesis was he would measure the force on the tool and try to keep it in certain boundaries. Because what he found is if you, in the process of machining, you go outside of the boundaries, what you're going to do is you're going to wear out the tool. But if you detect what the force is on the tool, make an adjustment that's quick enough to achieve the result, it will preserve the cutting edge by not going outside of the restrictive bounds. And so I don't think you can, you know, I think the board was correct in its claim construction. I don't think you can import some kind of time limit. And it certainly doesn't make any sense to adopt this essentially instantaneous construction that was raised for the first time today and is not supported by any expert testimony. Now the patent doesn't mention continuous, continuously, a couple of times. It says made. What's your comment about that? So that's true. The patent in two places refers to continuous. The board found, and a lot of you ultimately agreed, that when it says continuous, it's not talking about the machining operation. It's talking about the adjustment process. And so in other words, the whole, the idea of the adjustment process is you're monitoring, you're looking for excursions outside of the range. You're looking for chatter, you're looking for force that's going beyond some threshold. And so you can monitor for that continuously, even if the process has a pause in it. And I'll just say the word continuous. So the word continuous is never used to refer to the machining operation. The board specifically found that, and that isn't, I think, in dispute. And as you point out, it says made. I mean, so the appellant is not only trying to limit the claims to a particular embodiment. It doesn't really even apply since it's talking about the adjustment process. But it's saying it may happen. It's not saying it must happen. So there's certainly no reason or justification to read that continuousness into the claim. There's also a fact issue here. The way they're trying to use this continuous requirement is to say if anything pauses for any amount of time. So if the cutting tool is rotating but the feed pauses for even a second, suddenly the machining operation is no longer ongoing. But what the expert said is you're doing like a simple right corner cut, which is in a machining device. Like literally you're just making a cube. Like in the simplest shape you could imagine. Both experts agreed the feed would have to come to a stop in one direction. It would have to start up in the other direction. So these momentary pauses are an ordinary part of machining operations. So grafting this continuous language into the definition of real time where there's no basis in the specification, there's no factual basis under the record with the experts, just doesn't make any sense. The other issue that Council focused on was the dependent claims. And that focuses on specifically Claim 7, which adds to the independent claim the notion of a portable display device operatively associated with at least one controller such that the portable display device can inform a user of the adjustments made by the controller. So here again the patent says precious little about this idea. Probably because it's not very complicated. It's got a sentence or two saying, by the way, if you're making adjustments, you may want to send that to a display device. And it says it could be a personal digital assistant. That's exactly what EDI has. It has a personal digital assistant that receives information from a controller. But what the board found was that Claim 7 only requires that the display device can inform a user of the adjustments made by the controller. What's the evidence that the board based that particular decision on? It's literally reading the claim language. So this I think is how it reads the claim language. So the claim language literally says the portable device can inform a user of the adjustments. That's all that's required. And what the board found in applying that language was it says it doesn't require displaying adjustment information. It just basically means notify them that there's been an adjustment. That was at least one basis for its decision. And that was never disputed. That's something as simple as identifying the fact that adjustments were being made. Didn't the appellant introduce excellent evidence that disputes that point? They interpret that provision differently. They said a display device can inform a user of adjustments. They interpret that to be true. I guess the point I'm interested in is whether the evidence that was submitted by the appellant on this point that we're talking about with respect to Claim 7, whether that was ever rebutted by you. Absolutely, Your Honor. There was expert testimony from Haas's expert that when you combine the ARABI, which is making real-time measurements. That was agreed. It was making adjustments. You're talking about what Eddie teaches, right? No, I'm talking about ARABI. You're talking about something else, yeah. I'm asking you with respect to Eddie. Oh, I think it was – so Eddie was not relied upon by the petitioner, Haas, to show the adjustments. It was relied upon to show the display. And there was a combination. And there was specific argument in the petition. For example, at page 64 of the petition, where it was argued that a faceta would have appreciated that Eddie's display system, when incorporated into ARABI's adaptive control system, would be configured to store and display the sense parameters, including adjustments to the spindle speed, feed rate, cutting rate on the portable device. Similarly, for Delio, in the petition, it was argued, supported by the expert, that a faceta would have recognized the advantages of having Eddie's portable device to display the sense and calculated values generated by Delio's system to monitor the status of the machining operation. So you've got, in ARABI, in Delio, you've got it creating these adjustments. And expert testimony and the board's conclusion that it would have been obvious that you would – you have that information, you have a display. So Eddie doesn't need to teach making the adjustments or transmitting the information about the adjustments. It just has to teach. Because that's – you get all that from ARABI or the other one, right? That's right. They're the ones that make the adjustments and have the information about those. All you're going to ED for is a system that will display that information once it's transmitted to it. That's correct. It's a portable display. Now, we did point out all the ways in which it would be easy to combine those systems, because ED has a lot of details about collecting information from a system and monitoring changes. But the combination we were relying on, the controller, that's – the controller that we're focused on is in CLAIM-1. That's in ARABI. ARABI's making the changes, the adjustments. It's also in the Delio reference that's making the changes. That's all going on there. And then it just would supply that to an external display. And that would be provided by ED. Going back to the question I asked your friend on the other side, ED only displays operational data. And he said that's correct. Do you agree with that? No, I don't agree with that, Your Honor. It does display operational data. It also did calculations. I mean, if you're just talking about ED in isolation, not combined with ARABI, it was doing much more complicated displays. Some of those were shown in the figures and the petitions. The question is whether the data that is displayed by ED, whether it can inform a user of the adjustments that are made by the controller. And I had a little difficulty on this particular point. I think there's two ways you can get there. The reason I had difficulty is I don't see any evidence on the other side. They presented evidence that is largely unrebutted. Can you address that? Yeah, the expert declaration that was submitted and relied on by the board does point to and say the adjustment information would come from ARABI, it would come from Delio, and it would be obvious to display that on ED. The board also found that even if you just looked at adjusting parameters, like if you had a system that was programmed to run at 1,000 RPM and you saw an adjustment to 1,100 RPM, that would inform a user. Remember, you don't have to display the changes. You just have to inform the user about an adjustment. That would inform a user of an adjustment. If you think about the Delio system in particular, it has very distinctive features that would be obvious to the user, where you have a feed halt where the feed goes to zero. Does it inform as to an adjustment, or does it inform as to how the adjustment was made or what the specific adjustment is? It shows of the adjustment, what the adjustment was, everything. If you're showing for the Delio feed halt, you would see the feed suddenly drop from a steady feed rate to zero for a millisecond. You would see the speed change, and then you'd see the feed rate go back. That profile only relates to a feed halt in Delio. A user seeing that can come to one conclusion or one conclusion only, there was an adjustment made because there was chatter recognized and an adjustment made to address it. Thank you, counsel. Thank you, Your Honor. Mr. Brunelli has a little rebuttal time. Thank you, Your Honor. Your Honor, speaking up with Claim 7, several questions, I'll answer them. One question was concerning rebuttal evidence on whether the rebuttal evidence question was posed. I'm reading from appendix page 1954. This is the deposition of the expert of Haas' question. So not every change in current would necessarily indicate an adjustment to the power exerted by the spindle drive system or feed drive system by a controller, correct? Was that an objection? The witness answers. In general, not every change in current is due to the adjustments by the adaptive and adaptive control system. I think that is specific. Finding by their own expert that adjustments can be made for many reasons, and if you're not identifying what reason an adjustment is being made, you can't inform the user that it was made by the controller. Next, there was a question of what did the board point to in deciding obviousness of claims 7 and 8 with regard to the combination of Ormby and Eddy, pointed to pages 62 and 68 of the petition, which is at appendix 192 to 198. With regard to the combination of Delio and Eddy, it points to the petition, pages 109 to 113. That's appendix pages 239 to 243. If you look at those pages, there is nothing about the controller information. The information indicating that the controller made an adjustment set forth, and that is the significant problem. With regard to the claim construction issue in real time, there was a notion that the patent does not list time limits. I would take issue with that. It does. It specifically says real time. We, in common parlance, know what real time is. It is essentially instantaneous. It incorporates the notion of continuous. The plain and ordinary meaning of real time does not come down to a particular result divorced from a time response constraint. Thank you for your time. Thank you, counsel. The case is submitted. That concludes today's audience.